UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PETER KERMANI, as Chairman of the Albany
County Republican Party and the Albany County
Republican Committee,

                              Plaintiff,

        -against-                                       1:06-CV-0589
                                                          (LEK/DRH)

NEW YORK STATE BOARD OF ELECTIONS;
NEIL W. KELLEHER (in his official capacity as a
Commissioner of the New York State Board of
Elections); DOUGLAS A. KELLNER (in his
official capacity as a Commissioner of the New
York State Board of Elections); EVELYN J.
AQUILA (in her official capacity as a Commissioner
of the New York State Board of Elections); and
HELENA MOSES DONOHUE (in her official
capacity as a Commissioner of the New York State
Board of Elections),

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER[1]

### I. Background

*A. Brief History*

[F]inancing elections with private money was a part of American politics before the states
even united.  In a 1757 race for a seat at Virginia's House of Burgess, a fresh-faced ex-
lieutenant named George Washington "provided his friends with 'the customary means of
winning votes,'" delivering a quart and a half of cider, wine and beer to each of the 391
voters in his district.

Benjamin S. Feuer, Comment, *Between Political Speech and Cold, Hard Cash: Evaluating the*

---

[1] For printed publication by the Federal Reporters.

1

*FEC's New Regulations for 527 Groups*, 100 Nw. U. L. Rev. 925, 932 (2006).

The rapidly growing costs of elections have fueled the primacy of "money issues". By the late 1990's, the cost of the Presidential election had already crossed the one-billion dollar threshold, and the cost of all Congressional elections was already six-hundred and sixty million dollars. See Kathleen M. Sullivan, *Political Money and Freedom of Speech*, 30 U.C. Davis L. Rev. 663, 663 (1997). Although on a lesser scale, the State races in New York - for Governor, Assembly and Senate, among others - have been increasing in cost, as well. And, the trend of spiraling campaign costs started back in 1896, when William McKinley spent *seven million* dollars (in 1896 dollars) defeating William Jennings Bryan for the Presidency. Bryan had spent "only" six-hundred and fifty thousand dollars. That campaign was the start of mass-media advertising, with work by professional political operatives. See Feuer, *supra*, at 933 & n.62.

In addition to the sheer weight of monetary pressures, outright corruption and anti-competitive practices contributed to the need for regulation in elections. The most well-known example from American history is a veritable synonym for political control and corruption - Tammany Hall, and the infamous William Marcy "Boss" Tweed. Associated with the Democratic Party, Tammany Hall controlled much of New York politics, and New York governance, in the 19th and early 20th Centuries. See "Tweed, William Marcy", Encyclopædia Britannica, Encyclopædia Britannica Premium Service, *at* http://www.britannica.com/ebc/article-9381403 (last visited July 5, 2006); "Tammany Hall", Encyclopædia Britannica, Encyclopædia Britannica Premium Service, *at* http://www.britannica.com/ebc/article-9380198?query=tammany%20hall&ct (last visited July 5, 2006).

It was Tweed's and Tammany's control of political and monetary machinery that led to the

Progressive effort to regulate campaign activities and spending.  One of the fruits of that effort is the statute at issue in the above-captioned matter - New York Election Law § 2-126.  See TR at 6-10.[2] Although the statute's current form is as passed by the New York State Legislature in 1976, and amended in 1978, see N.Y. ELEC. LAW § 2-126 (Credits; Historical & Statutory Notes), the statute's prior versions stretch back into the early 1900's,[3] when legislative action was taken in 1909 (Election Law § 562), and 1922 and 1949 (Election Law § 19), see id.

But, in addition to finance, election laws also set requirements for the election of Party Committee members, who in turn elect Party leaders.  In New York, State and County Party Committee members are, generally, elected to two-year terms.  See N.Y. ELEC. LAW §§ 2-102, 2-104 & 2-106.  See also TR at 20-22.  The time within which the newly constituted committees shall meet, organize, and elect officers and a Chairman are set by statute, as well.  See N.Y. ELEC. LAW § 2-112.  And, these statutes also have a history extending back into the early 1900's.  See N.Y. ELEC. LAW §§ 2-102, 2-104, 2-106 & 2-112 (Credits; Historical & Statutory Notes).  Party leaders, and the Committee members who elect them, are answerable directly to the Party membership.  See TR at 22.  There are also methods by which judicial review may be sought, in limited circumstances.  See, generally, 50 N.Y. JUR. 2D Elections §§ 780 & 781.  Thus, it is much less likely that present-day Parties would have a totalitarian "boss" like William Tweed.

### B.  Facts of the Present Matter

The parties have submitted papers (Dkt. Nos. 3, 11, 12 & 15), and argument was heard at a

---

[2] "TR" refers to the transcript from the hearing held on Tuesday, June 20, 2006.

[3] See Defts' Mem. of Law in Opp. (Dkt. No. 12) at 13 n.1.

hearing held on Tuesday, June 20, 2006 (Minute Entry (Dkt. No. 16)).

Plaintiff Peter Kermani ("Plaintiff"), as Chairman, brings this action on behalf of the Albany County Republican Party and Albany County Republican Committee, by Amended Complaint (Dkt. No. 20), together with an Order to Show Cause (Dkt. No. 4), requesting that this Court impose a preliminary injunction (Dkt. No. 3) so as to enjoin enforcement by Defendants of New York Election Law § 2-126, which Plaintiff contends is an unconstitutional restriction of political party, political party organization and political party committee speech and expression during State primary elections, in violation of the First Amendment to the United States Constitution.[4]  Said statute provides that no money may be contributed or expended in aid of the designation or nomination of a party candidate at the primary election.  Plaintiff, therefore, brings these claims pursuant to 42 U.S.C. §§ 1983 and 1988 for deprivation of rights that are secured by the First and

---

[4] The Court wishes to note the following at the outset.  First, this decision only addresses New York Election Law § 2-126 as it applies to restrictions of political party, political party organization and political party committee expenditures during State primary elections.  This decision does not apply to Federal elections, since the provisions of the Federal Election Campaign Act of 1971 ("FECA") preempt State laws that purport to regulate activities in Federal elections.  See 2 U.S.C. § 453(a) ("Subject to subsection (b) of this section, the provisions of this Act, and of rules prescribed under this Act, supersede and preempt *any provision of State law* with respect to election to Federal office.") (emphasis added); Seltzer v. New York State Democratic Comm., 743 N.Y.S.2d 565 (2d Dep't 2002) (rejecting unpublished decision of the Eastern District of New York in same case, and finding that in Federal elections New York Election Law § 2-126 is preempted by the provisions of FECA).  See also F.E.C. Advis. Op. 2000-23 (Sept. 29, 2000) (non-binding finding that FECA preempted New York Election Law § 2-126 in Federal campaigns); F.E.C. Advis. Op. 1995-41 (Dec. 7, 1995) (non-binding finding that FECA preempted New York State campaign finance laws and regulations in Federal campaigns).

Second, the Court notes that this decision addresses § 2-126 only as it applies to political parties, political party organizations or political party committees.  The Court is not concerned with political action committees ("PACs") or other organizations, as they are different animals, and provisions concerning regulation of their activities are not at issue here.  See, generally, TR at 30.

Lastly, this decision applies to *primary* elections, but not general elections.  The parties have generally agreed that § 2-126 only applies to regulate the activities and expenditures of political parties, political party organizations or political party committees during State primary elections.

4

Fourteenth Amendments to the United States Constitution.  See Amended Complaint (Dkt. No. 20) at ¶ 1; Affirm. of Marcelle (Dkt. No. 3, Attach. 3).

The New York State Board of Elections and its Commissioners ("Defendants") will enforce § 2-126 against Plaintiff.  See Amended Complaint (Dkt. No. 20) at ¶ 5.  Plaintiff is seeking the following relief:

1.) An order declaring New York State Election Law § 2-126 unconstitutional;
2.) An award of one dollar ($1.00) in nominal damages;
3.) An order enjoining Defendant from enforcing Election Law § 2-126;
4.) An award of fees and costs to Plaintiff, pursuant to 42 U.S.C. § 1988; and
5.) Other and further relief as the Court finds just and proper.

See Amended Complaint (Dkt. No. 20) at p. 9.

Defendants argue that Plaintiff has not shown irreparable harm or a likelihood of success on the merits, and thus injunctive relief is not warranted.  See Affirm. of McCann (Dkt. No. 11).  Defendants also argue, inter alia, that the Complaint raises claims upon which relief cannot be granted; that Plaintiff fails to allege a present case or controversy, and therefore lacks Article III standing; that Plaintiff's claims are not ripe; and that the Eleventh Amendment bars this action.  See Answer (Dkt. No. 8).  Defendants further contend that § 2-126 does not prohibit Party spending for issue ads, voter registration, or "other traditional political party activities", but rather "restricts... expenditure directed specifically 'in aid of' a particular candidate, and only during the primary election - an election intended precisely for the democratic resolution of intraparty differences."  Defts' Mem. of Law in Opp. (Dkt. No. 12) at 14-15.  In addition, Defendants concede that Plaintiff, and the Party and Committee, are free to hold rallies and encourage party members to volunteer for endorsed candidates - without expending any money.  See id.  The Party may even sponsor a slate, and possibly permit use of party headquarters by the slate, so long as the Party does not expend any

additional monies above and beyond what it would for rent, mortgage, taxes, upkeep, etc., so as to otherwise be "in aid" of the slate or candidate(s).  See id. at 15.[5]

Plaintiff wishes to, *inter alia*, communicate in various ways with voters concerning the candidate(s) supported by the Party, and to offer support (financial, legal and the like) to Plaintiff's chosen candidate(s) in the primary.  The Party posits that some of its spending or contributions would be independent - meaning the candidate would not have requested endorsement or assistance, and would not have suggested or cooperated in activities.  See Amended Complaint (Dkt. No. 20) at ¶¶ 14, 17-18 & n.1.  See also N.Y. ELEC. LAW § 14-100(9)(3).  But, Plaintiff also seeks to have the ability to directly support primary candidates with free legal assistance, and to provide them with campaign materials (lawn signs, cards, and the like), which are coordinated expenditures.  See Decl. of Kermani (Dkt. No. 3, Attach. 2) at ¶ 10.  However, Plaintiff has been informed that such activity is illegal under the New York statute (see § 2-126), and violation could result in criminal conviction.  See Amended Complaint (Dkt. No. 20) at ¶¶ 19-30.  Plaintiff claims this is a significant, unconstitutional restriction.  See Plntf's Mem. of Law (Dkt. No. 3, Attach. 4).  And, indeed, Plaintiff asserts that Political Parties are the only entities in New York to suffer from said

---

[5] See also Horn v. Regular Democratic Org. of Long Beach, Inc., 300 N.Y.S.2d 146 (Sup. Ct. Nassau County 1969) (sponsorship of slate and use of party headquarters permitted so long as no expenditures of money, or additional expenditures in the case of rent or utilities, etc., for headquarters, by the Party); Werner v. Nassau County Republican Comm., 232 N.Y.S.2d 617 (Sup. Ct. Nassau County 1962) (finding that a "Primary Committee" is not a Party Committee under the definition of Election Law §§ 10 & 19 - precursors to the current Election Law sections; thus, the activity of the Primary Committee did not violate the provisions of § 19 prohibiting expenditures of money by political Parties or their committees).  Defendants, too, argue that the Plaintiff may resolve its concerns by forming a pre-primary committee, which could raise funds separate from Party funds, and thereby make expenditures during the primary contest.  See Defts' Mem. of Law in Opp. (Dkt. No. 12) at 15-16.  The Court notes, however, that Political Parties should not be required to, in effect, delegate their speech and association rights to others, and this restriction is unconstitutional for the reasons provided in the Discussion section, *infra*.

unconstitutional restriction, given that independent and coordinated expenditures by Political Parties in primary elections are the only ones "capped" at zero dollars.  See id. at 5-7.

Defendants support their position and enforcement of the Election Law provisions by arguing that the current provisions, as enacted, work to reduce or prevent instances of both corruption and unfair competition/anti-competitive primary elections.  See, *inter alia*, TR at 6-14; Defts' Mem. of Law in Opp. (Dkt. No. 12) at 10-11, 13-14.

Plaintiff states that Defendant has, on prior occasions, vehemently enforced the provisions of § 2-126.  See Amended Complaint (Dkt. No. 20) at ¶¶ 33-34; Avella v. Batt, 785 N.Y.S.2d 305 (Sup. Ct. Albany County 2004) (involving activity during the primary contest for Albany County District Attorney).  And, Plaintiff cites precedent addressing election anti-competition concerns as being insufficient justification for First Amendment restrictions.  See Plntf's Mem. of Law in Reply (Dkt. No. 15, Attach. 1).

Defendants argue, as an affirmative defense, that their actions have been in compliance with all State and Federal constitutional provisions, laws and regulations. See Answer (Dkt. No. 8) at ¶ 9.

For the reasoning below, this Court finds that the burden for the issuance of a preliminary injunction has been satisfied, and such injunction shall issue pending final resolution of the matter.

## II.  Discussion

*A.  Applicable Standard of Law*

New York State Election Law § 2-126 provides as follows:

**§ 2-126. Party funds; restrictions on expenditures**
No contributions of money, or the equivalent thereof, made, directly or indirectly, to any party, or to any party committee or to any person representing or acting on behalf of a party or party committee, or any moneys in the treasury of any party, or party committee, shall be expended in aid of the designation or nomination of any person to be voted for at a primary election either as a candidate for nomination for public office, or for any party position.

N.Y. ELEC. LAW § 2-126.  See also 50 N.Y. JUR. 2D *Elections* § 500 (discussing § 2-126 and relevant case law).

"A preliminary injunction is an 'extraordinary remedy that should not be granted as a routine matter.'" Keesh v. Smith, No. 9:04 CV 0779 NAM GJD, 2006 WL 516793, at *2 (N.D.N.Y. Mar. 2, 2006) (Mordue, D.J.) (citing and quoting Patton v. Dole, 806 F.2d 24, 28 (2d Cir. 1986)).  For a District Court to grant a preliminary injunction, the following standard must be applied.  "[T]he moving party must show (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992).  See also Eng v. Smith, 849 F.2d 80, 81-82 (2d Cir. 1988); Marriott v. County of Montgomery, 426 F. Supp. 2d 1, 11 (N.D.N.Y. 2006) (Hurd, D.J.); Roucchio v. LeFevre, 850 F. Supp. 143, 144 (N.D.N.Y. 1994) (McAvoy, C.J.; DiBianco, M.J.).  The Second Circuit has held that a movant need not show absolute certainty that success will be had on the merits.  The law merely requires that a likelihood be shown - a better than fifty percent chance of success.  "There may remain considerable room for doubt." Eng, 849 F.2d at 82.  However, "[w]hen the injunction alters the status quo, as does this one, plaintiffs must show a substantial likelihood of success." Price v. Saugerties Cent. Sch. Dist., No. 105CV0465LEKDRH, 2006 WL 314458, at *2 (N.D.N.Y. Feb. 9, 2006) (Kahn, D.J.) (citing Green Party of New York State v. New York State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004)).

Furthermore, of all the factors to consider, the existence of irreparable harm is generally the most important and significant, and is a type of harm that a monetary award will not remedy.  See Goldblatt v. Englander Commc'n, L.L.C., No. 06 Civ. 3208(RWS), 2006 WL 1321468, at *4

(S.D.N.Y. May 16, 2006) ("The showing of irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction.'... An irreparable injury is one that cannot be redressed through a monetary award.... Where monetary damages are adequate compensation, a preliminary injunction will not issue.") (citations omitted); Keesh, 2006 WL 516793, at *3 ("'The showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction."'") (quoting Brown v. Middaugh, No. 96-CV-1097, 1998 WL 566791, at *1 (N.D.N.Y. Sept. 3, 1998) (Munson, Senior D.J.)).

### A.  Irreparable Harm

In matters involving allegations or claims of First Amendment violations, irreparable harm may be presumed.  See Price, 2006 WL 314458, at *2 ("'[W]here a First Amendment right has been violated, the irreparable harm requirement for the issuance of a preliminary injunction has been satisfied.'") (citing and quoting Green Party of New York State, 389 F.3d at 418).  But, the presumption disappears if the movant does not satisfy the second prong of the above standard.  See Bad Frog Brewery, Inc. v. New York State Liquor Auth., No. 96-CV-1668 (FJS), 1996 WL 705786, at *2 & n.3 (N.D.N.Y. Dec. 5, 1996) (Scullin, D.J.) ("Because the gravamen of this action alleges the violation of the plaintiff's First Amendment rights, irreparable harm is presumed.  However,... if the movant fails to clearly show a loss of Constitutional rights on the second prong of the preliminary injunction standard, the presumption is extinguished.").

Therefore, irreparable harm being presumed in this matter alleging deprivation of rights secured by the First and Fourteenth Amendments, the Court now considers the second prong of the preliminary injunction standard.

9

*B.  Likelihood of Success - Constitutionality of New York Election Law § 2-126*

This Court finds that Plaintiff has raised an issue upon which relief may be granted, and a live case or controversy does exist, given that primaries for State and local office are anticipated in the coming election year.  And, by virtue of the fact that the challenge to the election laws in this matter could continue to arise in each future election year, and since the time window for review is relatively short, see TR at 17-18, the Court believes the issue to be one that is capable of repetition yet could evade review, such that even any claim or defense of mootness based upon a failure to challenge prior application will not be viewed as a bar.  See, generally, Soleil v. State of New York, No. Civ.A. CV043247DGT, 2005 WL 662682, at *4 (E.D.N.Y. Mar. 22, 2005).

It is understood that "New York's election statutes are afforded a 'strong presumption of constitutionality.'... New York's constitutional power to regulate elections is justified as a way to ensure orderly, rather than chaotic, operation of the democratic process...."  Soleil, 2005 WL 662682, at *5 (citing New Alliance Party v. New York State Bd. of Elections, 861 F. Supp. 282, 292, 294 (S.D.N.Y. 1994)).

Furthermore, when a court considers the constitutionality of the election law of a State, the court must:

> [B]alance the regulation's burden on the First and Fourteenth Amendment rights of voters against the state interests advanced by the regulation, taking into consideration the extent to which the burden is necessary to the advancement of those interests.  When the regulation severely restricts the relevant rights [i.e., speech, association or right to vote], it must be narrowly drawn to advance a compelling state interest, but where the regulation imposes only reasonable, nondiscriminatory restrictions on those rights, the State's important regulatory interests are generally sufficient to justify the restrictions.

Soleil, 2005 WL 662682, at *5 (citing Queens County Republican Comm. v. New York Bd. of Elections, 222 F. Supp. 2d 341, 347-348 (E.D.N.Y. 2002) (quoting Prestia v. O'Connor, 178 F.3d 86, 88 (2d Cir. 1999)).  Restrictions on independent expenditures are reviewed under a standard of

heightened scrutiny, and face a tougher challenge to "clear the hurdles before them" than restrictions on other activities, such as coordinated contributions or expenditures.  See Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 386-88 (2000) (Souter, J.) (citing, inter alia, Buckley v. Valeo, 424 U.S. 1 (1976); Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 259-60 (1986)).

The Court has considered all of the factors impacting upon a finding of unconstitutionality, and the State's regulatory interests, and has concluded that the current form of § 2-126 and its prohibitions violate the constitutional protections afforded speech, expression and association, by imposing limits - in effect zero-dollar ($0) limits - upon both uncoordinated, independent expenditures and coordinated expenditures and contributions by political parties and their political organizations and political committees during primary elections for State and local office.

### 1.  Uncoordinated, Independent Expenditures

As to independent expenditures that political parties choose to make on their own, to communicate their positions, choices, preferences and views in an election contest (in the same way that citizens or groups may purchase advertising in newspapers or on television), restrictions on that monetary/political speech as imposed by § 2-126 are unconstitutional.  The United States Supreme Court has drawn a line separating independent expenditures from campaign contribution limits, and has held independent expenditures to be a different creature freer from restriction.  See Buckley, 424 U.S. at 26-29.[6]  See also Shrink Missouri, 528 U.S. at 386 (discussing Buckley's line drawing).

---

[6] Although Buckley was concerned with the provisions of a Federal election statute, its constitutional dictates are generally applicable to review of State or Federal statutes, see Shrink Missouri, 528 U.S. 377, and its precedential value has been reaffirmed in later case law addressing both State and Federal provisions, including those addressing independent, uncoordinated expenditures by political parties.  See, e.g., Discussion, infra.

Furthermore, the Supreme Court has found that not all Party expenditures are coordinated expenditures.  See Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n, 518 U.S. 604, 619-20 (1996).  See also TR at 27-29.

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.... This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.  The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs.  Speeches and rallies generally necessitate hiring a hall and publicizing the event.  The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.  The expenditure limitations... represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech.

Buckley, 424 U.S. at 19 (footnote omitted).  The Court provided a unique and compelling analogy when discussing limitations imposed upon expression through expenditures: "[b]eing free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline."  Id. at 19 n.18.

The Supreme Court has also addressed expenditure and contribution limitations and political parties in several more recent opinions, including Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n, 518 U.S. 604 (1996) ("Colorado I") (Breyer, J., plurality op.), and Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431 (2001) ("Colorado II") (Souter, J.).  Specifically, the Supreme Court, by plurality opinion, stated that "[w]e conclude that the First Amendment prohibits the application of [the provision at issue - limiting expenditures in general elections] to the kind of expenditure at issue here - an *expenditure* that the political party has made *independently, without coordination* with any candidate."  Colorado I, 518 U.S. at 608 (emphasis added).[7]  Although the Court has rejected challenges to limits on *coordinated expenditures* by political parties, see Colorado II, the Supreme Court has explained that it previously, in Buckley and other decisions, held unconstitutional those provisions of legislation that had, *inter alia*, "limited the right of individuals to make '*independent*' *expenditures* (not coordinated

---

[7] Justice Breyer issued the plurality opinion, which Justices O'Connor and Souter joined, and Chief Justice Rehnquist and Justices Scalia, Kennedy, and Thomas concurred in the judgment.

with the candidate or candidate's campaign)". <u>Colorado I</u>, 518 U.S. at 610 (citing <u>Buckley</u>, 424

U.S. at 39-51) (emphasis added).[8]

> Given [the] established principles, we do not see how a provision that limits a political party's independent expenditures can escape their controlling effect.  A political party's independent expression not only reflects its members' views about the philosophical and governmental matters that bind them together, it also seeks to convince others to join those members in a practical democratic task, the task of creating a government that voters can instruct and hold responsible for subsequent success or failure.  The independent expression of a political party's views is "core" First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees.... We are not aware of any special dangers of corruption associated with political parties that tip the constitutional balance in a different direction.

<u>Colorado I</u>, 518 U.S. at 615-16 (citing <u>Eu v. San Francisco County Democratic Cent. Comm.</u>, 489

U.S. 214 (1989)).

    The Eighth Circuit addressed an issue similar to the one presently at bar, concerning a

Missouri statute, and found that although political party contributions to candidates or coordinated

expenditures may be limited or restricted, independent expenditures may not be.

> The mode of discussion that the party chooses, moreover, may include advertising campaigns designated to promote issues and candidates, so long as those campaigns are not coordinated with those candidates.  "The independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees,"... and it is therefore not subject to limitation.  The Missouri Republican Party may "spend money in support of a candidate without legal limit so long as it spends independently."

---

[8] In fact, the Supreme Court has found unconstitutional provisions of Federal law that have appeared to force political parties to choose between limited coordinated expenditures or unlimited independent expenditures, with certain "magic words" in advertisements and materials being burdened if a particular level of coordinated expenditures were reached.  <u>See</u> <u>McConnell v. Fed. Election Comm'n</u>, 540 U.S. 93, 213-19 (2003) ("All three judges on the District Court concluded that the provision placed an unconstitutional burden on the parties' right to make unlimited independent expenditures.... In the end, we agree with that conclusion but believe it important to identify certain complexities in the text of [the challenged statute] that affect our analysis of the issue.... In sum, the coverage of [the new, challenged statute] is much more limited than it initially appears.  A party that wishes to spend more than $5,000 in coordination with its nominee is forced to forgo only the narrow category of independent expenditures that make use of magic words.  But while the category of burdened speech is relatively small, it plainly is entitled to First Amendment protection.") (citing <u>Buckley</u>, 424 U.S. at 44-45, 48; other citations omitted).

Missouri Republican Party v. Lamb, 270 F.3d 567, 571 (8th Cir. 2001) (citing Colorado I and

Colorado II), cert. denied sub nom., Missouri Republican Party v. Connor, 535 U.S. 1113 (2002).

See also Homans v. City of Albuquerque, 264 F.3d 1240 (10th Cir. 2001) (pending appeal, Court

enjoined enforcement of city ordinance as it purported to limit campaign *expenditures* by

candidates, in violation of the First Amendment and Supreme Court precedents including Buckley

and Colorado).

     This Court reads the Buckley decision, and the Buckley and Colorado Courts' distinctions as

having real teeth, and binding application in the matter at hand.

     Furthermore, there is no ground for relying on prior historical justifications based upon the

goal of fighting corruption or the appearance of corruption in elections.[9]

> [T]he Court has said that restrictions on independent expenditures significantly impair the
> ability of individuals and groups to engage in direct political advocacy and "represent
> substantial... restraints on the quantity and diversity of political speech."... And at the same
> time, the Court has concluded that limitations on independent expenditures are less directly
> related to preventing corruption, since "[t]he absence of prearrangement and coordination of
> an expenditure with the candidate... not only undermines the value of the expenditure to the
> candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for
> improper commitments from the candidate."

Colorado I, 518 U.S. at 615 (quoting Buckley, 424 U.S. at 19, 47). "In any case, the constitutionally

significant fact,... is the lack of coordination between the candidate and the source of the

expenditure.... This fact prevents us from assuming, absent convincing evidence to the contrary, that

a limitation on political parties' independent expenditures is necessary to combat a substantial

danger of corruption of the electoral system." Id. (citing, *inter alia*, Buckley, 424 U.S. at 45-46).

     Indeed, the Supreme Court, as recently as June, 2006, issued a decision concerning a

Vermont State statute, in which the Court rejected an anti-corruption justification, and also

---

    [9] Although, such justification may support some restrictions on *contributions*. See,
generally, McConnell, 540 U.S. 93.

reiterated its now three-decade old stance as to limits on expenditures.  See Randall v. Sorrell, ---

U.S. ---, Nos. 04-1528, 04-1530 & 04-1697, 2006 WL 1725360 (June 26, 2006) (Breyer, J., plurality

op.).

> Over the last 30 years, in considering the constitutionality of a host of different campaign
> finance statutes, this Court has repeatedly adhered to Buckley's constraints, including those
> on expenditure limits.... The Court has often recognized the "fundamental importance" of
> stare decisis, the basic legal principle that commands judicial respect for a court's earlier
> decisions and the rules of law they embody.... Departure from precedent is exceptional, and
> requires "special justification."... This is especially true where, as here, the principle has
> become settled through iteration and reiteration over a long period of time.  We can find here
> no such special justification that would require us to overrule Buckley.  Subsequent case law
> has not made Buckley a legal anomaly or otherwise undermined its basic legal principles....
> The respondents have not shown, for example, any dramatic increase in corruption or its
> appearance in Vermont; nor have they shown that expenditure limits are the only way to
> attack that problem.... At the same time, Buckley has promoted considerable reliance.
> Congress and state legislatures have used Buckley when drafting campaign finance laws.
> And, as we have said, this Court has followed Buckley, upholding and applying its reasoning
> in later cases.  Overruling Buckley now would dramatically undermine this reliance on our
> settled precedent.

Randall, 2006 WL 1725360, at *8-*11 (citations omitted).

The Randall Court struck down the provisions of the Vermont State campaign finance

statute (Vt. Stat. Ann., Tit. 17, § 2801 et seq., Public Act No. 64), which, "limits both (1) the

amounts that candidates for state office may spend on their campaigns (expenditure limitations) and

(2) the amounts that individuals, organizations, and political parties may contribute to those

campaigns (contribution limitations)."  Randall,  2006 WL 1725360, at *5.  Although Randall, too,

focused largely on the expenditure rights of candidates, this Court extends the reading of it, and

prior case law, to include political parties and others who are both directly and indirectly involved in

political contests (for it is difficult to become more involved or invested in a political contest than

the candidates themselves).[10]

---

[10] Although the Randall Court's plurality opinion mentions the statute/Legislature's
presumption that certain Party expenditures could be, or are, coordinated with candidates, the Court
did not examine said presumption, given that the Court instead found Act 64's expenditure and
contribution limits to be unconstitutional in that case.  See Randall, 2006 WL 1725360, at *22.

The plurality decision held, at the outset, that: "[w]ell-established precedent makes clear that the expenditure limits violate the First Amendment." Id. (citing Buckley, 424 U.S. at 54-58).

And, the Tenth Circuit has previously commented, when considering a preliminary injunction pending appeal, that the constitutionality of expenditure limitations is tested under the Supreme Court precedent and "clear statement that such limitations are subject to 'the exacting scrutiny applicable to limitations on core First Amendment rights of political expression' and do not survive even under the rationale of (1) *deterring corruption and preventing evasion of contribution limits*, (2) equalizing the financial resources of the candidates, and (3) restraining the cost of election campaigns for its own sake." Homans, 264 F.3d at 1243-44 (emphasis added; citing Buckley, 424 U.S. at 54-55).

In fact, should there be any doubt that the Supreme Court's position on the distinction will change, "the Supreme Court has not suggested that the distinction between campaign expenditures and campaign contributions is about to change." Homans, 264 F.3d at 1244 (citing Colorado II). See also Randall, 2006 WL 1725360, at *8-*11. If anything, some of the Justices and others appear to lean toward an erasure of the line of distinction, and the protection of both contributions and expenditures. See, e.g., Sullivan, *supra*, at 666-67; Richard Briffault, *Public Funding and Democratic Elections*, 148 U. PA. L. REV. 563, 564 (1999) ("One school of thought, championed by Justice Clarence Thomas and a diverse and growing group of legal scholars, would say 'go back,' that is, deregulate. They would scrap FECA's prohibitions, restrictions, and contribution limitations, and preserve only some reporting and disclosure requirements.") (footnotes omitted; citing, *inter alia*, Colorado I, 518 U.S. at 641-44 (Thomas, J., dissenting)). See also Randall, 2006 WL 1725360, at *24-*27 (Thomas, J., concurring in judgment; joined by Scalia, J.).

Therefore, this Court finds at this time that there is a likelihood that Plaintiff will succeed in proving that the provisions of § 2-126, by prohibiting uncoordinated, independent expenditures, are

unconstitutional at any amount.

## 2.  Coordinated Expenditures or Contributions

As clear as the Supreme Court has been that limits on independent, uncoordinated expenditures are unconstitutional, the Court has been equally clear that limits on contributions and coordinated expenditures (expenditures made to a candidate or campaign, or made in cooperation with a candidate or campaign) may survive constitutional scrutiny.  See Buckley, 424 U.S. 1; Colorado II, 533 U.S. 431; Randall, 2006 WL 1725360.

But, the Randall Court also noted that limits and restrictions that are set too low by the Legislature can work more harm than good, and can violate constitutional protections.

> Nonetheless, as *Buckley* acknowledged, we must recognize the existence of some lower bound.  At some point the constitutional risks to the democratic electoral process become too great.  After all, the interests underlying contribution limits, preventing corruption and the appearance of corruption, "directly implicate the integrity of our electoral process."... Yet that rationale does not simply mean "the lower the limit, the better."  That is because contribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability.  Were we to ignore that fact, a statute that seeks to regulate campaign contributions could itself prove an obstacle to the very electoral fairness it seeks to promote.  Thus, we see no alternative to the exercise of independent judicial judgment as a statute reaches those outer limits.  And, where there is strong indication in a particular case, i.e., danger signs, that such risks exist (both present in kind and likely serious in degree), courts... must review the record independently and carefully with an eye toward assessing the statute's "tailoring," that is, toward assessing the proportionality of the restrictions.

Randall, 2006 WL 1725360, at *13 (citing Buckley, 424 U.S. at 21, 30; McConnell, 540 U.S. at 136-37; Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984)).

Contribution limits cannot be set lower than zero dollars.  This "in the dirt" limit already arouses the Court's suspicions as to unconstitutionality.  Furthermore, the Court has evaluated Defendants' proffered justifications and defenses - namely, prevention of corruption or the appearance of corruption, "leveling of the playing field" in primary elections, and promotion of anti-competitive practices.  See, e.g., TR at 6-14; Defts' Mem. of Law in Opp. (Dkt. No. 12) at 10-11,

13-14.  And, this Court fails to see the connection between Defendants' position, and a prohibition on the spending or contributing of even one penny by Political Parties in primary election contests. Although the constitutional hurdle for political contribution limits is not as high as that for independent expenditures, the statute must still be "'closely drawn' to match a 'sufficiently important interest.'"  See McConnell, 540 U.S. at 136.  The Court finds that New York Election Law § 2-126, is not narrowly tailored enough to survive constitutional scrutiny.  The statute is underinclusive, in that the Legislature has targeted a specific group (political parties), and has completely eliminated that group's ability to communicate and affiliate through coordinated expenditures and contributions.

Therefore, this Court finds that there is a likelihood that Plaintiff will succeed in proving that the zero-dollar ($0) limitations on coordinated expenditures and contributions are unconstitutional. However, this Court will not pass judgment as to what level of contribution or coordinated expenditure limitation shall be set under New York law - being that this Court lacks the "scalpel to probe" the various levels of coordinated spending and contribution limits that are not constitutionally invalid.  That determination, and the public policy justifications for said limitation, is best made by the New York State Legislature.

But, since coordinated expenditures and contributions may be subjected to certain constitutional limitations, an issue arises as to the void left by this Court's preliminarily enjoining enforcement of § 2-126 in the upcoming election cycle.  It may take some time for the State Legislature to produce a new statutory provision.  In the meantime, New York would be left with limitless spending during election season - a result that the Legislature, acting on behalf of the People, clearly wished to avoid.  The interests of justice move this Court to prevent runaway spending that might provide Parties with an end-run around later constitutional limitations while the Legislature is presently at work.  Therefore, the Court will stay, for one (1) year, the portion of the

preliminary injunction issued herein only as it applies to coordinated expenditures and

contributions, so as to provide the State Legislature time to re-consider the statutory provisions.

### 3.  Prior New York State Case Law

While it is noted that decisions of the New York State Supreme Court, Appellate Division,

Fourth Department, and Appellate Division, Third Department, have split in their findings as to the

constitutionality of § 2-126, see; Baran v. Giambra, 705 N.Y.S.2d 740 (4th Dep't 1999) (involving

activity during contest for county executive); Avella v. Batt, No. 98847, 2006 WL 2010851 (N.Y.

App.Div. 3rd Dep't July 20, 2006) (involving activity during the primary contest for Albany County

District Attorney), Federal courts, whether in a diversity case or in a non-diversity case, will "not

give effect... to a state statute that violates the Constitution of the United States", Indus. Consultants,

Inc. v. H.S. Equities, Inc., 646 F.2d 746, 749 (2d Cir. 1981) (citing Cohen v. Beneficial Indus. Loan

Corp., 337 U.S. 541, 547 (1949)).  Federal District Courts are not bound to adopt or follow the

decisions of State courts when the State courts interpret Federal constitutional principles, even when

those principles are applied to state statutes.  See H.S. Equities, Inc., 646 F.2d at 749.

This Court rejects the prior reasoning of the Appellate Division, Fourth Department, and

adopts the reasoning of the Third Department as far as applied to independent, uncoordinated

expenditures.  This Court finds that § 2-126, as applied to prohibit independent expenditures by

political parties and related entities during primary elections is an unconstitutional restriction of

protected activity.  Given the current laws governing election of Party Committee members, and

selection of officers and Party Chairs, there is little danger in this age to justify restrictions based

upon outdated concerns over anti-competitive elections or corrupt practices presided over by a Party

"boss" who does not answer to the rank-and-file Party membership - the other justifications

advanced by Defendants.  See TR 20-22.  In fact, Party Chairs are not even exempt from State

financial disclosure provisions because disclosure of financial interests enables "state regulators and

the concerned citizenry" to inspect the interests, in an attempt to avoid unethical uses of political

relationships.  See Igneri v. Moore, 898 F.2d 870, 877 (2d Cir. 1990).

### 4.  Conclusion

Political parties are a vital fabric of our democracy and have a fundamental right to choose

and support candidates they believe best represent their political views and agenda.  The State Board

of Elections contends that this law was a progressive reform passed in the early 20th century which

was intended to "level the playing field."  In reality, the opposite result is achieved.  If a chosen

candidate of the political party has inadequate finances and the challenger is wealthy, the Party must

stand by helplessly as its candidate is overwhelmed by "outsider" money.

This antiquated statute, § 2-126, underestimates the independence of the primary voter on

election day, the committee people who are elected every two years and the political leaders who

govern their party.  Political Party leaders, committee people and active Political Party workers

invest deeply in the political process and cannot be constrained by unwarranted and illogical

governmental intrusion.

While there is a legitimate concern that unchecked political contributions could taint the

political process, the expenditure of funds from the coffers of a Political Party itself to support its

own chosen candidates is perhaps the least tainted process.  It openly allows a party to support its

choices.  Suggestions that political leaders who devote so much of their time and passion to the

political process do not truly represent the Party until after primary day undervalue the intelligence

of the primary voter and the integrity of the political process.

Therefore, Plaintiff has demonstrated both irreparable harm absent the granting of a

preliminary injunction, and a substantial likelihood of success on the merits.  The Court rejects

Defendants' contention that Federal precedent addresses general elections, and is thus inapplicable

to this challenge addressing primary elections.  See Defts' Mem. of Law in Opp. (Dkt. No. 12) at 21.

The Court herein finds a violation of Plaintiff's constitutional rights. "[T]he First Amendment does not 'belong' to any definable category of persons or entities: It belongs to all who exercise its freedoms." First Nat'l Bank v. Bellotti, 435 U.S. 765, 802 (1978). And, in the same way, it does not apply only to certain activities. There should be no requirement that the Constitution "ring the doorbell" before crossing the threshold of application - rather, it simply walks right through the doorway.

Plaintiff's Motion for a preliminary injunction, as contained in the Order to Show Cause, is granted. Defendants are hereby **prohibited and enjoined from enforcing** the provisions of New York Election Law § 2-126 against any political party, political party organization or political party committee as a bar to any amount of **independent expenditures** in primary elections for State office(s), but the Court will **stay**, **for one (1) year**, the portion of the preliminary injunction issued herein **as it applies to coordinated expenditures and contributions**, to provide the State Legislature time to re-consider the statutory provisions.

### C.  Security

Federal Rule of Civil Procedure 65(c) requires that the Court condition a grant of a preliminary injunction upon the "giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). However, this Court has discretion in determining the amount of security that will be required, *if any*. See Corrigan Dispatch Co. v. Casa Guzman, S.A., 569 F.2d 300, 302-03 (5th Cir. 1978) (per curiam) ("Rule [65(c)] requires security only in 'such sum as the court deems proper.'... The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all.") (citing Int'l Controls Corp. v. Vesco, 490 F.2d 1334 (2d Cir. 1974)); Citizens for a Better

Env't v. Vill. of Elm Grove, Wis., 472 F. Supp. 1183, 1184 (E.D. Wis. 1979) ("The district judge has the discretion to determine what amount of security, if any, is necessary to protect the enjoined party's interest.... It follows from these propositions that when the reasonable possibility of damage to the enjoined party has passed, a district judge may in his discretion release the bond.") (citing, *inter alia*, Wayne Chem., Inc. v. Columbus Agency Serv. Corp., 567 F.2d 692, 701 (7th Cir. 1977)). See also Livestock Mktg. Ass'n v. United States Dep't of Agric., 132 F. Supp. 2d 817 (D.S.D. 2001).

Upon consideration of the positions of the parties, and the fact that neither party stands to suffer any significant monetary losses from the issuance or denial of the preliminary injunction, and given the important constitutional and public policy issues arising in this matter, the Court finds that no security shall be required for the issuance of this preliminary injunction.

### *D.  Nominal Damages, Costs and Attorney's Fees*

As this Memorandum-Decision and Order grants only a preliminary injunction, and does not yet resolve the case in full, this Court finds that an award of nominal damages would be inappropriate at this time.  Therefore, Plaintiff's request for nominal damages is denied without prejudice until the conclusion of this matter, at which time it will be reconsidered.

But, Plaintiff may recover costs and attorney's fees for the preliminary injunction phase of this matter, if this Court's grant of the preliminary injunction was based on a consideration of the merits - which it was.  See Degrafinreid v. Ricks, No. 03 Civ.6645(RWS), 2004 WL 944517, at *2 (S.D.N.Y. May 4, 2004) ("'Although a party can sometimes attain "prevailing party" status by obtaining temporary relief, it can do so only when the decision to grant such relief is on the merits.'... When a party has received a stay or preliminary injunction but not a final judgment, for instance, attorney's fees may nonetheless be proper 'if the court's action in granting the preliminary

injunction [was] governed by its assessment of the merits.'... No fees are warranted, however, if the court did not base its determination to award interim relief on the merits.") (citing and quoting, *inter alia*, <u>LaTrieste Restaurant v. Vill. of Port Chester</u>, 188 F.3d 65, 71 (2d Cir. 1999); <u>Haley v. Pataki</u>, 106 F.3d 478, 483 (2d Cir. 1997)).

Generally, in the United States parties bear their own litigation costs.  But, in 1976 Congress changed this rule, making an award of attorney's fees available in civil rights cases pursuant to 42 U.S.C. § 1988.  <u>See</u> <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 429 (1983).  "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances....  Accordingly, a prevailing plaintiff '"should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."'"  <u>Id.</u> (citations omitted).  "The amount of the fee, of course, must be determined on the facts of each case."  <u>Id.</u>  Furthermore, "[a]ll the plaintiff must do to qualify as a prevailing party is to 'obtain an enforceable judgment against the defendant from whom fees are sought.'... '[A] judgment--declaratory or otherwise–"will constitute relief, for purposes of § 1988, if and only if, it affects the behavior of the defendant toward the plaintiff."'"  <u>Marriott v. County of Montgomery</u>, No. 5:03 CV 531, 2006 WL 951125, at *8 (N.D.N.Y. Apr. 12, 2006) (Hurd, D.J.) (citing, *inter alia*, <u>Farrar v. Hobby</u>, 506 U.S. 103, 110-11 (1992)).

But, this Court is not prepared to award costs or attorney's fees to prevailing Plaintiff at this time, considering the lack of information as to the relevant factors that will inform this Court's decision as to a calculation of, *inter alia*, the lodestar amount and reasonable fees.  <u>See</u> <u>Farbotko v. Clinton County of New York</u>, 433 F.3d 204 (2d Cir. 2005).  Therefore, if Plaintiff wishes to seek an award of costs and attorney's fees, Plaintiff shall submit a motion and briefing on the issue within thirty (30) days of the filing date of this Memorandum-Decision and Order.  At this time, Plaintiff's request for costs and attorney's fees is denied without prejudice.

### III. Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED**, that Plaintiff's Motion for a **PRELIMINARY INJUNCTION** (Dkt. Nos. 3 &

4), included in Plaintiff's Order to Show Cause, is **GRANTED**.  **Plaintiff SHALL NOT be**

**required to post SECURITY for this preliminary injunction** as otherwise required by Federal

Rule of Civil Procedure 65(c); and it is further

**ORDERED**, that enforcement of **§ 2-126 of the New York Election Law** is

**PRELIMINARILY ENJOINED** as an **unconstitutional restriction of Plaintiff's rights as**

**secured by the First and Fourteenth Amendments to the United States Constitution**; and it is

further

**ORDERED**, that the Court will **STAY**, for **ONE (1) YEAR**, the portion of the preliminary

injunction issued herein **ONLY AS IT APPLIES TO COORDINATED EXPENDITURES AND**

**CONTRIBUTIONS**, so as to provide the New York State Legislature time to re-consider the

statutory provisions; and it is further

**ORDERED**, that Defendants **ARE PROHIBITED and ENJOINED** from enforcing the

provisions of New York Election Law § 2-126 against any and all political parties, political party

organizations or political party committees.  Defendants may not bar **independent, uncoordinated**

**expenditures** by any political parties, political party organizations or political party committees in

primary elections for State office(s).  Defendants may not bring enforcement actions against or

otherwise prosecute (civilly or criminally) any political parties, political party organizations or

political party committees for **independent, uncoordinated expenditures** made during primary

elections for State office(s); and it is further

**ORDERED**, that Plaintiff's request for costs and attorney's fees, pursuant to 42 U.S.C.

§ 1988, is **DENIED WITHOUT PREJUDICE**.  If Plaintiff wishes to seek an award of costs and

attorney's fees, Plaintiff shall submit a motion and briefing on the issue within **THIRTY (30)**

**DAYS** of the filing date of this Memorandum-Decision and Order; and it is further

      **ORDERED**, that Plaintiff's request for nominal damages is **DENIED WITHOUT**

**PREJUDICE** until the conclusion of this matter, at which time it will be reconsidered; and it is

further

      **ORDERED**, that, although the Court is not consolidating Plaintiff's Motion with a trial on

the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), the Court hereby notifies the parties

that the **Rule 16 Conference will go forward on Tuesday, September 19, 2006**, and this Court

requests that Judge Homer set an expedited schedule; and it is further

      **ORDERED**, that the Clerk serve a copy of this Order on all parties.

      **IT IS SO ORDERED**.

DATED:      July 25, 2006
             Albany, New York

                      Lawrence E. Kahn
                      U.S. District Judge